**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE  DIVISION**

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
August 05, 2026
LAURA A. AUSTIN, CLERK
BY:  s/J.Vasquez
      DEPUTY CLERK

| | | |
|---|---|---|
| **KEVIN A. WATSON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:24CV00298 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **M. HAMILTON, et al.,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendants. | ) | |

*Kevin A. Watson, Pro Se Plaintiff; Ann-Marie White Rene, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONAL LITIGATION SECTION, Richmond, Virginia, for Defendants.*

The plaintiff, Kevin A. Watson, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights based on their conduct following his refusal to take a tuberculosis (TB) test for religious reasons.[1]  Currently pending is Defendants' Motion for Summary Judgment (Motion).  Def.'s Mot. Summ. J., Dkt. No. 78.  The Motion has been briefed by the parties and is ripe for review.  Upon consideration, I conclude that the Motion must be granted, and all claims pending in this matter will be dismissed for the reasons that follow.

---

[1] By Opinion and Order entered August 20, 2025, Watson's Complaint was severed into three separate causes of action.  Op. & Order 7–8, Dkt. No. 59.  This case consists of Watson's claims A, B, C, D, E, F, M, N, and Q against defendants Hamilton, Ramey, White, Manis, Dotson, Holbrook, Trent, Gilbert, Grubb, Duncan, and the Commonwealth of Virginia. *Id.*

## I. WATSON'S COMPLAINT.

At all relevant times, Watson was housed at Red Onion State Prison (ROSP). According to his Complaint, Watson refused to participate in the prison's annual TB testing on religious grounds and was subsequently disciplined.

On July 11, 2022, defendant Hamilton, a nurse at the facility, requested that Watson submit to the TB skin injection test.[2] Watson refused the test "upon religious grounds" and insisted that she instead conduct a chest X ray, an alternative TB testing option he received in previous years. Compl. 4, Dkt. No. 1. Watson claims he overheard Hamilton tell another nurse that she "hate[s] black Muslims for thinking they can use their religion as an excuse for everything, trying to make us believe their religious lies." *Id.* at 22. Based on Watson's refusal to comply with the available TB screening method, Hamilton issued a disciplinary charge against him, which included a penalty of ninety days loss of good time credit. Defendant Gilbert certified the charge and defendant Grubb served the charge upon Watson.

A disciplinary hearing was held on August 19, 2022, and Watson pled not guilty. Although medical records presented at the hearing showed that Watson

---

[2] The Infectious Disease Control policy, attached to the defendants' memorandum in support of their Motion, defines TB as "[a]n airborne communicable disease caused by Myobacterium Tuberculosis or the tubercle bacillus. [TB] is an acute or chronic infection chiefly of the lungs, spread primarily through inhalation of aerosolized particles containing viable bacilli coughed up by an infected person." Def.'s Mem. Supp. Summ. J. Trent Aff. Encl. A at 4, Dkt. Not. 79-4.

received chest X rays in the past, Hamilton testified that chest X rays were no longer offered due to a recent policy change. Watson claims that the referenced policy was not produced at the hearing. Defendant Ramey found Watson guilty and imposed the ninety-day loss of good time penalty. Defendant Day reviewed and approved Ramey's decision.

Watson appealed on September 13, 2022, claiming that his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the Constitution were violated by the medical staff's failure to provide him with an alternative to the TB skin injection test. The prison warden, defendant White, reviewed the appeal and found no error. White reasoned that the "test is not a vaccine but preventative therapy. Nurse Hamilton stated that it was explained to you that you have the right to refuse, but you will receive a charge for refusal to participate in preventative/prophylactic therapies. You admitted you refused and you received a charge according to policy." *Id.* at 14.

Watson then submitted a level two appeal to the regional administrator, defendant Manis, who upheld the decision and found no procedural errors. Manis explained that

> the contentions you presented with your level two appeal were only facsimiles of contentions already answered in full with your level one appeal response and/or during your original hearing. The purpose of the level two appeal is not to allow you to argue the facts of your case once more. You are not given the choice to unilaterally exempt yourself

from the policy without a mandatory penalty of loss of 90 days good time.

*Id.* at 17.

On November 7, 2022, Watson submitted a medical request for a chest X ray "as a medical exemption for the [TB] skin injection chemical test because of his religious belief restriction." *Id.* at 22. In response, defendant Holbrook stated that the "chest X ray is not a screen for TB." *Id.* Watson submitted a written complaint based on Holbrook's response, alleging that she "is refusing to provide plaintiff a medical exemption for the [TB] skin injection chemical test." *Id.* at 23. Defendant Trent responded and asked that Watson provide the name of his religion. *Id.* According to Watson, after advising Trent of his religion and the reason for seeking a religious exemption to the TB skin injection test, Hamilton responded that "we do not have any religious exemptions for the [TB test]." *Id.* Watson thereafter submitted a regular grievance, complaining of violations under RLUIPA. Per Watson, the grievance ombudsman did not log the grievance because it was repetitive to a prior grievance, but he contends that the issue with the prior grievance was regarding defendant Duncan's refusal to approve a different medical accommodation request.

On December 19, 2023, the then-director of the Virginia Department of Corrections (VDOC), defendant Dotson, overturned the disciplinary decision and restored Watson's loss of good time. But according to Watson, Dotson has failed to

ensure his employees comply with federal laws and has not approved an alternative to the TB skin injection test.

Finally, Watson alleges that the Commonwealth of Virginia has entered into a contract with the federal government under RLUIPA to receive federal funding for its religious programs and, as a third-party beneficiary to this contract, he has lost his religious property rights.

Based on the foregoing, Watson has set forth the following claims at issue in this proceeding:

**Claim A:**   Defendant Hamilton retaliated against Watson by filing a disciplinary charge against him for refusing a skin injection TB test at Red Onion State Prison (ROSP), in violation of the Plaintiff's First Amendment rights.  Compl. 3, ECF No. 1.

**Claim B:**   Defendant Ramey retaliated against Watson by finding him guilty at his disciplinary hearing for the charge of refusing the TB test at ROSP, in violation of Watson's First Amendment rights. *Id*. at 8-9.

**Claim C:**   Defendant White violated Watson's RLUIPA and/or Fourteenth Amendment rights by failing to investigate and correct the fact that Watson had been charged and convicted of a disciplinary conviction for refusing the TB test. *Id*. at 13.

**Claim D:**   Defendant Manis violated Watson's RLUIPA and/or Fourteenth Amendment rights by failing to investigate and correct the fact that Watson had been charged and convicted of a disciplinary conviction for refusing the TB test. *Id*. at 15-16.

**Claim E:**   Defendant Dotson violated Watson's RLUIPA rights by failing to provide for an alternative type of TB test that is not a "skin injection chemical test." *Id*. at 18.

**Claim F:** Defendants Hamilton, Holbrook, Trent and Duncan conspired among themselves to violate Watson's equal protection rights by refusing to provide him with an alternative to the TB skin injection test. *Id*. at 20.

**Claim M:** Defendant Hamilton violated Watson's Fourth and Fourteenth Amendment rights by "manufactu[ring] false inculpatory evidence which led to [Watson's] unreasonable seizure and to his prison disciplinary hearing guilty decision." *Id*. at 41-42.

**Claim N:** Defendants Hamilton, Gilbert, Grubb, Ramey, Day, White, and Manis violated Watson's Fourteenth Amendment and/or RLUIPA rights by charging, convicting, and/or upholding Watson's disciplinary conviction for refusing the TB skin injection test. *Id*. at 44-45.

**Claim Q:** The Commonwealth of Virginia breached a RLUIPA contract with the federal government, "the Defendant Healthcare Provider and [Watson as a] third-party beneficiary" when Watson was not provided an alternative to the TB skin injection test. *Id*. at 49-53.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

The defendants assert that they are entitled to summary judgment on all of Watson's claims against them. First, they contend that Watson has failed to exhaust his administrative remedies as to claims A, B, C, D, E, and F. Second, the defendants argue that Watson's claims under the Constitution, RLUIPA, or conspiracy laws cannot survive. Finally, the defendants assert that the Commonwealth of Virginia is entitled to Eleventh Amendment Immunity and that Watson's breach of contract claim is not cognizable. Watson disagrees.

A.  Standard of Review.

Rule 56 of the Federal Rules of Civil Procedure provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* In considering a motion for summary judgment, the court must view the facts and justifiable inferences in the light most favorable to the nonmoving party. *Id.* at 312-13. To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

B.  Exhaustion of Administrative Remedies.

The defendants assert that Watson has failed to exhaust his administrative remedies as to claims A, B, C, D, E, and F.[3] Specifically, they argue that Watson did not exhaust his administrative remedies regarding his "allegations about being retaliated against or any VDOC employees conspiring against him in regard to the

---

[3] To the extent that other claims may not have been exhausted, I will not address that possibility as the defendants have not raised the argument. *See Jones v. Bock*, 549 U.S. 199, 216 (2007) (concluding that "failure to exhaust is an affirmative defense under the [Prisoner Litigation Reform Act]").

TB skin test, or VDOC failing to provide a policy for exemptions based upon religious objections to the TB skin test." Def.'s Mem. Supp. Mot. Summ. J. 16, Dkt. No. 79.

Under the Prison Litigation Reform Act (PLRA), a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted his available administrative remedies. 42 U.S.C. § 1997e(a). This exhaustion requirement is "mandatory," *Ross v. Blake*, 578 U.S. 632, 638 (2016), and "applies to all inmate suits about prison life." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the prison facility provides to its inmates and meet all deadlines within that procedure. *Woodford v. Ngo*, 548 U.S. 81, 90-94 (2006). Even if the form of relief the inmate seeks in his lawsuit is not available through the prison's grievance proceedings, he must, nevertheless, exhaust properly all available remedies under that procedure before bringing a civil action in this court. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies. *Jones*, 549 U.S. at 216. Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, either that exhaustion occurred or that

administrative remedies were unavailable through no fault of the inmate. *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011).

In support of their exhaustion defense, the defendants have submitted an affidavit of T. Still, the prison's grievance coordinator, along with the facility's grievance policy and Watson's grievance records. Under the prison's Offender Grievance Procedure, exhaustion of the regular grievance procure is mandatory prior to initiating litigation. Def.'s Mem. Supp. Summ J. Still Aff. at ¶ 4, Dkt. No. 79-1. To initiate the grievance process, an inmate must first make a good faith effort to resolve the issue informally with a verbal complaint to a prison official. *Id.* at ¶ 7. If the issue remains unresolved, the inmate may then submit a completed written complaint form. *Id.* If the inmate is dissatisfied with the response, he may file a regular grievance. *Id.* A grievance must be accepted at intake or the inmate must resubmit it. *Id.* at ¶ 9. Then, the inmate must undertake two tiers of review: Level I, conducted by the warden or Superintendent of the facility, and Level II, conducted by the Regional Administrator, Health Services Director, or Chief of Operations, depending on the issue. *Id.* at ¶ 10. A matter is considered exhausted when the regular grievance has been accepted at intake and appealed through the highest level of review with no resolution. *Id.* at ¶ 12. Furthermore, "[a]ll inmates are oriented to the Offender Grievance Procedure when they are initially received into the VDOC." *Id.* at ¶ 14. Watson's signed orientation acknowledgment is enclosed,

showing that Watson received the Offender Grievance Procedure and other offender

rules and regulations as part of the Offender Orientation Handbook. *Id.* Encl. B.

According to the defendants, Watson did not exhaust available administrative

remedies for his claims related to retaliation, conspiracy, or religious exemptions to

the TB testing policy. The record partly supports this contention. Specifically, Still

declared that he reviewed Watson's grievances, and enclosed a copy of Watson's

grievance report from June 1, 2022, through January 5, 2026, which includes all

written complaints and grievances accepted at intake. According to Still,

> [Watson] submitted two Written Complaints and Regular Grievances
> about receiving an accommodation for the TB skin test. However,
> Watson did not file any Written Complaints or Regular Grievances
> related to being retaliated against and/or conspired against by any
> VDOC employees in regard to the TB test, or VDOC failing to provide
> a policy for exemptions based on religious objections to the TB test.

*Id.* at ¶ 18.

The grievance report reveals two relevant submissions. First, Watson

submitted a Reasonable Accommodation Request to the facility's Americans with

Disabilities Act (ADA) Coordinator, defendant Duncan, on October 7, 2022. His

request stated as follows:

> I request VDOC and R.O.S.P. Medical Dept., etc., to make a medical
> and religion accommodation for my religious belief restriction: "I shall
> not inject any chemical into my body." I request a chest X-Ray or any
> other screening that does not require injection of any chemical into my
> body as a medical and religion exemption for VDOC/R.O.S.P.
> enforcement of Fed./State Tuberculosis (TB) PPD injection skin test

screening per federal statute 42 U.S.C. Section 2000cc-1 et seq. (RLUIPA).

*Id.* Encl. at 47.  Duncan denied the request, stating that it "[d]oes not meet the definition of ADA" and advising that Watson could address the issue with the medical department.  *Id.*  From the record, it is unclear if Watson submitted a written complaint on the issue.  However, Watson filed a regular grievance, numbered ROSP-22-REG-00369, attaching his ADA request form as evidence of "other documentation used to satisfy the informal complaint process,"[4] and expressing his disagreement with Duncan's response.[5]  *Id.* at 45.  He further requested that his grievance be logged so he "can exhaust [his] prison administration remedies."  *Id.*

On Level I review, Watson's grievance was determined to be unfounded by defendant White.  *Id.* at 44.  Watson appealed the matter to Level II, and defendant Manis upheld the decision finding no policy violation.  *Id.* at 43.  Manis stated that

---

[4]  Under the Offender Grievance Procedure, a Request for Reasonable Accommodation can be submitted as supporting documentation when filing a regular grievance.  Def.'s Mem. Supp. Mot. Summ. J. Still Aff. Encl. A at 8, Dkt. No. 79-1. Furthermore, the Regular Grievance form includes a section where "[o]ther documentation used to satisfy the informal complaint process is attached" can be selected as an alternative to attaching the written complaint.  *Id.*  Encl. D.

[5]  Watson submitted this grievance on October 23, 2022, about three months after his refusal of the TB skin test and resulting disciplinary charge.  Although the grievance may have been untimely, the defendants do not make that argument, and I will not make any such determination.

Watson had exhausted his administrative remedies on this issue. *Id.* According to Still's Affidavit, this was recorded as ROSP-22-REG-00370 in the grievance log.

The purpose of the exhaustion requirement is to give prison officials a fair opportunity to address the problem that will later form the basis of the lawsuit. *Moore v. Bennette*, 517 F.3d 717, 729 (4th Cir. 2008). Clearly, there is no allegation of any retaliatory or conspiratorial acts by any of the defendants in Watson's grievance documents. Thus, it appears that he has failed to exhaust those claims. However, while the issue regarding his religious beliefs are cloaked in an ADA request, Watson has put officials on notice of this issue.[6] Although prison officials may have looked into the matter presented under the lens of the ADA, because Watson repeatedly mentioned RLUIPA and his desire for an alternative TB testing option for religious purposes, I cannot conclude that he failed to exhaust that issue when it was appealed through the highest level of review and defendant Manis specifically stated that Watson had exhausted his administrative remedies as to that grievance.

---

[6] Despite submitting his request on an ADA form, Watson does not raise any claims under the ADA in his Complaint. Because Watson's claims sound in religious liberty violations and he does not allege that he has a disability, I will not construe his pleadings as containing ADA allegations. *See, e.g., Jackson v. Dameron*, 171 F.4th 641, 654 (4th Cir. 2026) (concluding that a district court did not err when it did not construe a deliberate indifference claim as including an ADA violation based on review of the factual allegations themselves).

Second, Watson submitted a written complaint, numbered ROSP-22-INF-03174,[7] where he stated as follows:

> R.O.S.P. Medical Administrator/Provider is refusing to provide me a Medical exemption per my request for the Tuberculosis (TB) PPD injection screening. I requested the exemption because of my religious belief restriction. See: Attached Request Form. Medical Admin./Provider refusal violates my federal right under federal statute 42 U.S.C. Section 2000 et seq. (RLUIPA). Per (RLUIPA) Medical Admin./Provider must provide me a substitution for the (TB) injection screening. If chest-Xray is not a screen for TB, then why did R.O.S.P. medical use a chest X-Ray to screen me for (TB) in 2021?

*Id.* Encl. at 50, Dkt. No. 79-1. Attached to the written complaint is a completed Facility Request form, in which Watson requested a "medical accommodation" for the TB screening. *Id.* at 51. Although Watson did not state what his specific religion is, he stated that his "religion belief restriction is: 'I shall not inject any chemicals into my body.'" *Id.* The staff respondent stated that "[a] chest X ray is not a screen for TB." *Id.* In response to the written complaint, defendant Trent asked Watson to "[p]lease provide us the name of your religion so we can fully understand what you are referring." *Id.* Watson submitted a regular grievance with the same allegations. In response, Meade stated that Watson provided insufficient information and directed him to name his religious belief within five days. Watson did not seek Level

---

[7] Watson submitted this written complaint on November 21, 2022, about four months after his refusal of the TB skin test and resulting disciplinary charge, and stating that the date of the incident was November 18, 2022. Again, although the grievance may have been untimely or unrelated to the underlying issue, the defendants do not make that argument and I will refrain from making any such determination.

I review.  Therefore, Watson failed to exhaust his administrative remedies as to this second submission based on his failure to complete the process.

In any event, Watson's main contention is that he exhausted his administrative remedies by appealing the decisions on his disciplinary charge.  It is true that he appealed the disciplinary proceeding to the highest level, as evidenced by the Affidavit of K. Ramey, a Hearings Officer at ROSP, who conducted Watson's disciplinary hearing.  *Id.* Ramey Aff. at ¶ 14, Dkt. No. 79-3.  In each appellate document enclosed with Ramey's ffidavit, Watson's grounds for appeal included a violation of his First Amendment right to be free from retaliation, his rights under RLUIPA, and his Eighth Amendment right to be free from cruel and unusual punishments.  *Id.* Encl. at 58, 62.  But, as this court has explained, "the disciplinary hearing appeals process is distinct from the [g]rievance [p]rocedure, and fully appealing a disciplinary charge does not exhaust an inmate's administrative remedies."  *Carter v. Harrison*, No. 7:23-cv-00218, 2024 WL 32747188, at *4 (W.D. Va. Aug. 9, 2024).

In other cases where inmates have raised a similar argument, judges in this circuit have considered whether an appeal of a disciplinary action could constitute exhaustion, and determined that it could only if prison officials misrepresented the prisoner's procedural options, thus making remedies unavailable.  *See*, *e.g.*, *Allen v. Waldron*, No. 7:21-cv-00214, 2023 WL 4980210 (W.D. Va. Aug. 3, 2023) (denying

summary judgment on the issue of exhaustion where there was a dispute of fact as to whether the grievance procedure was available for a retaliation claim related to a disciplinary action or whether the prisoner was misled to believe such claims should be raised in his disciplinary appeal). Here, however, there is simply no evidence in the record that indicates that Watson was in any way misled or "repeatedly steered toward the disciplinary charge appeals process" by prison authorities. *See Carter*, 2024 WL 3747188, at *4.

Watson alternatively argues that administrative remedies were unavailable because he misunderstood the prison's rules. As the Supreme Court has outlined, an administrative remedy is unavailable when three kinds of circumstances are apparent: (1) the administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (2) "prison administrators thwart inmates from taking advantage of the grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–44.

Watson claims that he "used the wrong remedy through a reasonable misunderstanding of the rules." Pl.'s Resp. 4, Dkt. No. 89. I am unpersuaded. The prison's policies are clear, particularly where the Offender Grievance Procedure discusses the exhaustion requirement but the Offender Discipline Operating

Procedure does not. The Offender Grievance Procedure specifically states, "[t]his operating procedure defines the boundaries and steps required to constitute an exhaustion of administrative remedy for Judicial Review purposes." Def.'s Mem. Supp. Mot. Summ J. Still Aff. Encl. A. at 4, Dkt. No. 79-1. It provides a list of grievable issues, including retaliation and other actions of staff. *Id.* at 7. It further includes a provision that disciplinary hearing decisions, penalties, and procedural errors, which may be appealed in accordance with the Offender Discipline Operating Procedure, are non-grievable issues. *Id.* at 7. Furthermore, Still affirmed that all inmates are made aware of the Offender Grievance Procedure when they are initiated into the VDOC, and Watson acknowledged receiving the procedures as part of his Offender Orientation Handbook. Watson had even specifically asked officials to log his grievances so he could exhaust his administrative remedies, demonstrating that he knew of the need for the grievance procedure to be complete before attempting litigation. Thus, there is no evidence in the record showing that Watson's administrative remedies were unavailable based on any prison administrator's misrepresentation of the rules and procedures.

Finally, Watson insists that his retaliation and conspiracy claims were within the scope of his grievances, arguing that he is not required to identify every possible defendant or legal theory. Watson is correct that he is not required to name particular defendants in his grievances in order to satisfy the PLRA's exhaustion requirements;

-16-

however, as I previously explained, he must set forth his grievance claims in such a manner that prison officials have an opportunity to address the claims administratively in the first instance. *See Moore*, 517 F.3d at 725. As written, his grievances fail to do so on the issues of retaliation and conspiracy.

Ultimately, I conclude that Watson has failed to exhaust his retaliation and conspiracy claims,[8] and they must be dismissed. Furthermore, although it appears that Watson may have exhausted his religious rights claims, those cannot survive on their merits for the reasons that follow.

### C. RLUIPA and First Amendment Free Exercise Clause Claims.

As the Fourth Circuit recently said, "[a] prisoner asserting religious liberty claims has at least two arrows in his quiver: the First Amendment and the [RLUIPA]. But the RLUIPA arrow flies farther and strikes harder." *Roberts v. Engelke*, 180 F.4th 634, 638 (4th Cir. 2026).

RLUIPA provides that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if

---

[8] Contained in Watson's conspiracy claim is that the defendants may have violated his equal protection rights. However, it appears that Watson has abandoned any equal protection argument by failing to address it in his response. *See King v. O'Bannon*, 817 F.Supp.3d 354, 387 (E.D. Va. Jan. 22, 2026) (citing *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) for the proposition that parties waive or abandon their arguments at the summary judgment stage by failing to develop the argument or support their position). Instead, his response takes the position that the defendants conspired to retaliate against him and violate his rights under RLUIPA. Therefore, I will not address any equal protection remarks that may have been mentioned in passing at the pleadings stage.

the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).   "Congress has expressly mandated that RLUIPA be construed 'in favor of a broad protection of religious exercise.'" *Greenhill v. Clarke*, 944 F.3d 243, 250 (4th Cir. 2019) (quoting § 2000cc-3(g)).

Under RLUIPA, "the inmate bears the initial burden of establishing that a prison policy substantially burdens his or her ability to practice in accordance with a sincerely held religious belief." *Id.*   Then, "once the plaintiff makes the requisite initial showing, the burden shifts to the government to show that the prison policy is the least restrictive means of furthering a compelling governmental interest." *Id.*

At the outset, it's unclear whether Watson holds a sincere religious belief. Watson has stated that "[t]he name of [his] religion is: 'The Nation of Gods/Earths' a religion approved by (VA.DOC),"[9] and he refused the TB screening "because of [his] religious belief that: 'I shall not inject any chemicals into my body.'" Pl. Resp. Mot. Summ J. Ex. G., Dkt. No. 89-1.   The defendants maintain throughout the

---

[9]  Attached to Watson's response as Exhibit A is a page from a Memorandum from the Chief of Corrections Operations recognizing NOGE or NGE as a religion with the same rights and privileges afforded to all other religions in accordance with a 2017 federal court ruling, *Coward v. Robinson*, 276 F.Supp.3d 544, 575 (E.D. Va. 2017).

memorandum in support of their Motion that Watson has provided no specifics as to his religious beliefs. Indeed, he has not specifically explained how refraining from injection of chemicals into the body is a sincerely held belief under the religion's tenants. But because "RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of religion, whether or not compelled by, or central to, a system of belief,'" I will assume that Watson holds a sincere religious belief. *See Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012).

Still, Watson must prove that the TB skin injection test substantially burdens his exercise of religion. He has not made this showing. The term "substantial burden" has the same meaning in the RLUIPA context as it does in the First Amendment context. *Greenhill*, 944 F.3d at 250. Thus,

> a "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," . . . or one that forces a person to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning the precepts of her religion . . . on the other hand."

*Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Rev. Bd. Of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).

Here, Watson claims that the precept of his religion that would be abandoned by submitting to the TB skin injection test is his belief that he cannot inject "any harmful chemical into his body." Pl. Resp. at 9, Dkt. No. 89. He asserts that he was

"forced to choose between following a mandatory precept of his religion and receiving a disciplinary charge." *Id.* at 10.

According to affiant D. Trent, a registered nurse serving the Health Services Authority at the prison, inmates are to be screened for TB annually and the most effective testing method is the purified protein derivative (PPD) skin test. The test is administered by "injecting a small amount of solution made with [PPD] under the skin." Def.'s Mem. Supp. Mot. Summ. J. Trent Aff. ¶ 5, Dkt. No. 79-4. Imperatively, "the solution in the PPD test is not a 'chemical.'" *Id.* While Watson insists that the PPD test is harmful, he offers no evidence in support of that argument in order to dispute Trent's Affidavit. In fact, attached to Watson's response is an article from a Prison Legal News publication written by Eike Blohm, MD, titled, "Prisoner Health Update: Tuberculosis," which provides information consistent with Trent's description of the testing method. Specifically, the article states that "[a]ll prisoners should get a PPD test once a year" and, during that testing process, "[a] protein from the TB bacterium is injected under the skin." Pl. Resp. Ex. D, Dkt. No. 89-1. Upon review of the evidence submitted by both parties, PPD is not described as a "harmful chemical." Thus, no reasonable jury would be able to find that injection of the PPD substance for purposes of TB screening would violate a precept of Watson's religion.

Because Watson has not met his burden to establish a RLUIPA violation, the burden does not shift to the defendants to show that the prison policy is the least

-20-

restrictive means of furthering a compelling governmental interest.  Even so, Watson concedes that the defendants "have a compelling interest in testing prisoners for the [TB] disease."   *Id.* at 11.  Indeed, this court has noted that "[TB] testing unquestionably implicates important concerns regarding the safety of both inmates and prison[ officials], and absent compelling countervailing evidence, courts should defer to the determinations of prison administrators concerning the efficacy and practicality of the particular test they have selected."  *Canada v. Ray*, No. 7:08-cv-11219, 2011 WL 565611, at *4 n.7 (W.D. Va. Feb. 9, 2011).  Although Watson avers that the TB skin injection test is not the least restrictive means of furthering that governmental interest, his own evidence supports the contrary.  The Prison Legal News article Watson included provides that a blood test is also available as a testing method, "but [it is] more expensive."  Pl. Resp. Ex. D, Dkt. No. 89-1.  Furthermore, the article explains that a positive PPD test will "*then*" require a chest X ray.  *Id.* (emphasis added).  It does not suggest a chest X ray as an alternative to the PPD injection.  Trent's Affidavit provides a similar description.  As Trent declared, "the most effective testing is the [PPD] skin test" and, although a chest X ray is available, it is "typically ordered when an inmate has had a past positive TB skin test or an allergic reaction to the skin test," indicating the presence of TB.  Def.'s Mem. Supp. Mot. Summ J. Trent Aff. at ¶¶ 4–5, Dkt. No. 79-4.  The chest X ray cannot differentiate "between past, inactive TB and current, active TB," like the PPD test

-21-

can. *Id.* ¶ 4. Therefore, upon consideration of all the evidence, Watson has failed to create a genuine dispute of any material fact as to his claim that his religious beliefs have been substantially burdened under RLUIPA.

Finally, a Free Exercise claim under the First Amendment "affords less protection to inmates' free exercise rights than does RLUIPA." *Lovelace*, 472 F.3d at 200. To state a free exercise claim under the First Amendment, a plaintiff must allege that "'(1) he holds a sincere religious belief and (2) that his religious practice has been substantially burdened by the prison policy or practice.'" *Hammock v. Watts*, 146 F.4th 349, 365 (4th Cir. 2025) (quoting *Firewalker-Fields v. Lee*, 58 F.4th 104, 114 (4th Cir. 2023)). Once the plaintiff makes this "threshold" showing, the burden shifts to the defendants to "offer[] penological interests that justify its infringement on free exercise rights." *Id.* Then, "if the prison adequately alleges a penological interest, a plaintiff can still prevail if the policy is not reasonably related to that interest." *Id.* It's not until that point in the analysis that the factors outlined in *Turner v. Safley*, 482 U.S. 78, 89–90 (1987) are examined.[10] *Id.*

---

[10] The *Turner* test asks:

(1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

Because the RLUIPA claim has no merit where Watson has not met his burden of proving that the prison's TB testing policy substantially burdens his ability to practice his religion, Watson's First Amendment free exercise claim likewise cannot survive.[11]   Therefore, Watson's claims will be dismissed to the extent that they include allegations under RLUIPA and the First Amendment, and the defendants' Motion will be granted as to these claims.

### D.  Due Process Claims.

Watson claims that his due process rights were violated based on the defendants' conduct surrounding his disciplinary proceedings.  Specifically, Watson asserts that defendant Hamilton "manufactured false inculpatory evidence which led to [his] unreasonable seizure and to his prison disciplinary hearing guilty decision."  Compl. at 41-42, Dkt. No. 1.  He further claims that defendants Hamilton, Gilbert, Grubb, Ramey, Day, White, and Manis improperly charged, convicted, and/or upheld his disciplinary conviction for refusing the TB skin injection test.  *Id.* at 44-

---

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (citing *Lovelace*, 472 F.3d at 200).

[11] Furthermore, because Watson has not defeated the first step by showing that the prison's policies imposed a substantial burden on his exercise of a sincerely held religious belief, I need not move on to the "next step" by applying the factors set forth under *Turner*. *See Roberts*, 180 F.4th at 647 (explaining that "once an inmates shows that a prison has substantially burdened his right to practice his religion, the next step" under the First Amendment is for the prison to "show that the free-exercise restriction was 'reasonably adapted to achieving a legitimate penological objective' by applying the *Turner* factors.") (quoting *Wall*, 741 F.3d at 499)).

45. Finally, he contends that defendants White and Manis failed to investigate and correct the fact that he had been charged and convicted of a disciplinary conviction for refusing the TB test. *Id.* at 13, 15–16.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV § 1. To establish a due process violation, a prisoner must demonstrate that (1) he had a protected liberty interest, and (2) the defendant failed to afford minimally adequate process to protect that liberty interest. *Thorpe v. Clarke*, 37 F.4th 926, 941 (4th Cir. 2022). Without a federally protected interest at stake, the inmate has no federal claim to particular procedural protections. *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).

Here, the liberty interest at stake was Watson's penalty of ninety days loss of good time credit. Indeed, the Supreme Court has "recognized that constitutional procedural due process protections extend to prison disciplinary proceedings that could adversely impact an inmate's liberty interests—such as the loss of good time credits." *Lennear v. Wilson*, 937 F.3d 257, 268 (4th Cir. 2019) (referencing *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974)).

The defendants argue, however, that because his conviction has been overturned and his loss of good time credits have been restored to him, his due process claims are now moot. In response, Watson insists that his claims are not

-24-

moot because overturning the disciplinary charge only solved half the problem.  He

claims that because the defendants "did not give [him] any damage relief" for their

failure to investigate and correct the matter, his claims are still viable.  Pl. Resp. 16,

Dkt. No. 89.    However, an inmate does not have a constitutional right to an

investigation under § 1983.  *See Gilliam v. Sealey*, 932 F.3d 216, 240 (4th Cir. 2019)

("[T]here is no independent constitutional right to investigation of a third party.");

*see also*, *e.g.*, *Davis v. Hicks*, No. 7:24-cv-00653, 2026 WL 674202, at *5 (W.D. Va.

Mar. 10, 2026) (dismissing a claim under Federal Rule of Civil Procedure 12(b)(6)

where a plaintiff alleged that the defendants deprived him of due process by failing

to investigate issues in relation to a disciplinary proceeding).  While mootness may

not be the accurate description for the status of Watson's claims, the record shows

that Watson has not suffered any penalty that triggers due process protections where

his loss of good time credits have been restored.  *See Proctor v. Edmonds*, No. 7:18-

cv-00087, 2020 WL 2312036, at *1 (W.D. Va. May 8, 2020). Therefore, Watson

cannot establish a due process violation, and the defendants are entitled to summary

judgment on such claims.[12]

---

[12] Watson further claims that his Fourth Amendment rights were violated by the conduct related to his disciplinary proceedings.  He claims that his conviction held him "under guilty status" from August 19, 2022, until December 19, 2023, when the decision was overturned, thus he was subjected to an "unreasonable seizure."  Compl. 41–44, Dkt. No. 1.  The defendants argue that Watson failed to explain how he had any reasonable expectation of privacy to support a viable Fourth Amendment claim.  Watson did not

E.  Breach of Contract.

In Claim Q, Watson claims that the Commonwealth of Virginia entered into a contract with the federal government under RLUIPA to receive funding for the VDOC's religious programs.  He asserts that one of the terms is that the VDOC is prohibited from placing a substantial burden on an inmate's religious practice.  By failing to provide an alternative to the TB skin test, Watson claims that the Commonwealth, through its agents, has failed to comply with its contractual obligation.  As relief for this claim, Watson seeks monetary damages.[13]

The defendants disagree, arguing that Watson's breach of contract claim is barred from review under the Eleventh Amendment, and stating that "[t]here is not a 'RLUIPA contract' between the Commonwealth of Virginia and the United States Government.  Rather, RLUIPA is a federal law that allows state inmates to bring a cause of action to vindicate a violation of their specific religious rights for injunctive relief only."  Def.'s Mem. Supp. Mot. Summ. J. 28, Dkt. No. 79.

---

address their argument in his Response and provided no evidence in support of a Fourth Amendment issue, therefore his claim is considered abandoned.

[13] Although a breach of contract claim falls under state law, federal "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished," particularly where state law claims are closely related to the original federal claims.  *Daly v. Zobel*, 311 F. App'x 565, 567 (4th Cir. 2008) (unpublished) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966) and *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)).  While Watson classifies his claim here as a breach of contract, because the crux of his allegations implicate religious rights, I conclude that it is appropriate to retain jurisdiction.

I agree that the Commonwealth is immune from Watson's breach of contract claim for damages. *See Gray v. Va. Sec'y of Trans.*, 662 S.E.2d 66, 70 (Va. 2008) (determining that, generally, the Commonwealth of Virginia is immune from actions at law for damages); *Ortiz v. Higgs*, No. 23-1102, 2023 WL 8251314, at *1 (4th Cir. Nov. 29, 2023) ("It is well established that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.'") (quoting *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)); *see also Napier v. Ohai*, No. 7:23-cv-00098, 2025 WL 2779900, at *3 (W.D. Va. Sept. 26, 2025) (dismissing claims against the Commonwealth of Virginia because it is not a "person" subject to suit under § 1983) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). And, to the extent that Watson is suing the Commonwealth under RLUIPA for its contractually analogous relationship with Congress to comply with RLUIPA's provisions in order to receive federal funding,[14] its immunity likewise bars Watson's claim for damages. *See Madison v. Virginia*, 474 F.3d 118, 133 (4th Cir. 2006) (concluding that the Eleventh Amendment bars a plaintiff's RLUIPA claim for damages against the State). Therefore, Watson's breach of contract claim must be dismissed.

---

[14] *See Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941, 43 (2026) (using a "contract analogy" to describe Congress's conditions attached to federal funds and explaining that, although a state agency "might be subject to certain private suits under RLUIPA for breaching its promises to the federal government," the only consequence for a federal funding recipient's noncompliance is termination of funds).

III.  CONCLUSION.

For all the reasons stated, the defendants' Motion for Summary Judgment will be granted, and each of the claims pending in this civil action will be dismissed. A separate Judgment will be entered.

ENTER:   August 5, 2026

/s/  JAMES P. JONES
Senior United States District Judge